## SMITH v. NEW YORK & MAINE GRANITE PAVING BLOCK CO.

(Circuit Court of Appeals, Second Circuit. June 15, 1893.)

SHIPPING—DEMURRAGE—CONSTRUCTION OF BILL OF LADING.

A bill of lading provided that "48 hours after arrival in port, and notice thereof to the consignee, there shall be allowed for receiving cargo at the rate of one day for every 75 tons thereof, after which the cargo consignee shall pay demurrage at the rate of six cents per ton." "After arrival and notice as aforesaid and the expiration of said 48 hours, said vessel shall have precedence in discharging over all vessels arriving, or giving notice, after her arrival; and for any violation of this provision she shall be compensated in demurrage," etc. *Held,* that the consignee has control of the ship hereunder as regards time and place of discharge, and is liable in demurrage for delay beyond the stipulated time on account of his failure to provide her a berth. 56 Fed. Rep. 525, affirmed.

Appeal from the District Court of the United States for the Southern District of New York.

In Admiralty. This was a libel by James N. Smith against the New York & Maine Granite Paving Block Company for demurrage. There was a decree for libelant, (56 Fed. Rep. 525,) and respondent appeals. Affirmed.

Geo. F. Harriman, for appellant.
Edward L. Owen, for appellee.

Before WALLACE, LACOMBE, and SHIPMAN, Circuit Judges.

PER CURIAM. This is an appeal from the decree of the district court, southern district of New York, awarding libelant damages by reason of the detention of the schooner Rachel Seaman in the discharge of her cargo in the port of New York. The schooner brought a cargo of 400 tons of paving stones to this port. arriving on the evening of July 23, 1891, and reporting to the consignee on the following day. She did not, however, obtain a berth until August 1st, completing her discharge within six days thereafter. The only question in the case is whether, under the bill of lading, which is in a peculiar form known as the "New Stone Bill of Lading," the vessel or the consignee was to provide the berth. The court held that the consignee had the right to select the wharf at which she should discharge. and had control of the ship as respects time and place of discharge, subject only to the payment of demurrage if the stipulated time allowed was exceeded; that the consignee failed to provide a wharf within the time stipulated, and that for the delay thus caused he was bound to pay demurrage.

In the absence of any custom or express contract, it is, no doubt, as the district judge found, the ship's business to find a berth in the port of discharge. The record is without proof of custom, and singularly barren of evidence calculated to throw light upon the somewhat obscure phraseology of this document, which constitutes the contract of the parties. In our opinion, however, there is

enough upon the face of the bill of lading to warrant the conclusion reached by the district judge. After the usual provisions as to shipment, delivery, and freight, the bill contains the following clauses:

"And 48 hours after the arrival at the above-named port, and notice thereof to the consignee, there shall be allowed for receiving cargo at the rate of one day, Sundays and legal holidays excepted, for every seventy-five tons thereof, after which the cargo consignee or assignee shall pay demurrage at the rate of six cents per ton. * * * After arrival and notice as aforesaid, and the expiration of said 48 hours, said vessel shall have precedence in discharging over all vessels arriving or giving notice after her arrival; and for any violation of this provision she shall be compensated in demurrage, as if while delayed by such violation her discharge had proceeded at the rate of one hundred and fifty tons per day."

The first of these clauses, if standing alone, would not indicate that the consignee was to control the discharge. Having given her 48 hours' notice, and provided herself with a berth, the ship might insist upon discharge there at the rate of 75 tons per day. Thus the ship, and the ship only, could fix the time when lay days should begin, irrespective of the convenience of the consignee's business. But the latter clause indicates that such was not the intention of the parties. By a clear implication it provides that the ship shall not have precedence in discharging over any vessels "arriving or giving notice before her arrival." This seems to contemplate that she must take her turn with other vessels coming to the same consignee, and must to that extent accommodate her time to the exigencies of his business. In the case at bar both master and consignee evidently understood that the ship was thus to wait her turn, presumably at a wharf of consignee's selection; but in this case that is immaterial. Upon arrival the master "asked if there was any chance for a berth," and the respondent promised to let his broker "know when there was," which eventually he did. Being thus required to await his turn with other ships, of whose arrival and notice to the consignee he knew nothing, the master was justified in waiting for a berth till he was informed by the consignee that his turn had come. That the consignee has failed to make any proof in the case of the fact (if it be a fact) that other ships were in ahead of the Rachel Seaman, thus excusing his delay in giving her prompt attention in turn, is his own oversight. Having failed to make such proof, he cannot avail of the excuse.

The decree of the district court is affirmed, with interest and costs.